**UNITED STATES of America**

v.

**RECOGNITION EQUIPMENT INCORPORATED, William G. Moore, Jr., and Robert W. Reedy, Defendants.**

**Crim. No. 88–0385.**

United States District Court, District of Columbia.

Nov. 20, 1989.

See also 720 F.Supp. 13.

Joseph B. Valder, Eric M. Acker, Asst. U.S. Attys., Criminal Div., Sp. Prosecutions, Washington, D.C., Vincent L. Gambale, U.S. Dept. of Justice, Criminal Div., Fraud Section, Washington, D.C., for U.S.

John P. Cooney, Julie R. O'Sullivan, R. Scott Thompson, H. Lin Shiau, Davis Polk & Wardwell, New York City, Linda Chatman Thomsen, Davis Polk & Wardwell, Washington, D.C., Morris Harrell, Marshall Searcey, Lori B. Finkelston, Locke Purnell Rain Harrell, Dallas, Tex., for REI.

Charles A. Stillman, Marjorie J. Peerce, Stillman, Friedman & Shaw, P.C., New York City, for Moore.

Robert S. Bennett, David S. Krakoff, Amy R. Sabrin, Dunnells, Duvall, Bennett & Porter, Washington, D.C., for Reedy.

**MEMORANDUM OPINION AND ORDER**

REVERCOMB, District Judge.

This matter is before the Court pursuant to Defendants' Joint Motion for Judgment of Acquittal. FED.R.CRIM.P. 29.

The Defendants have been indicted with one count of conspiracy to defraud the United States, 18 U.S.C. § 371, one count of theft, 18 U.S.C. §§ 1707 and 2, one count of receiving stolen property, D.C.Code §§ 22–3832(a), 22–3832(c)(1), 22–105, two counts of mail fraud, 18 U.S.C. §§ 1341, 2, and two counts of wire fraud, 18 U.S.C. §§ 1343, 2.

This Court finds that the government has failed to establish a prima facie case that the Defendants conspired to defraud the United States in violation of 18 U.S.C. § 371. The government's evidence is insufficient, even when viewed in the light most favorable to it, for a trier of fact to find guilt beyond a reasonable doubt. Much of what the government characterizes as incriminatory evidence is not persuasive of

guilt when viewed in its full context. In fact, some of the government's evidence is exculpatory and points toward innocent conduct of the Defendants. The government has conceded that in the absence of a prima facie finding of conspiracy all of the other counts in the indictment must also fail. Accordingly, it is hereby ordered that Defendants' motion for judgment of acquittal pursuant to FED.R.CRIM.P. 29 is granted.

## I. Rule 29 Standard

Rule 29 of the Federal Rules of Criminal Procedure provides: "The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment ... after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." The purpose of this Rule is to implement "the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant(s) may be put to [their] defense." *United States v. Shafer*, 384 F.Supp. 496, 497 (N.D.Ohio 1974) (quoting *Cephus v. United States*, 324 F.2d 893, 895 (D.C.Cir.1963)).

In considering a Rule 29 motion this Court must determine whether upon the evidence, viewed "in a light most favorable to the Government giving full play to the right of the [trier of fact] to determine credibility, weigh the evidence and draw justifiable inference of fact," a reasonable mind might fairly conclude guilt beyond a reasonable doubt.[1] *United States v. Treadwell*, 760 F.2d 327, 333 (D.C.Cir. 1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986) (citing *United States v. Davis*, 562 F.2d 681, 683 (D.C.Cir. 1977)); *see also United States v. Reese*, 561 F.2d 894 (D.C.Cir.1977); *Curley v. United States*, 160 F.2d 229, 232 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1512, 91

L.Ed. 1850, *reh'g denied*, 331 U.S. 869, 67 S.Ct. 1729, 91 L.Ed. 1872 (1947). Although the evidence must be viewed in the light most favorable to the government, this Court is obligated to take a hard look at the evidence and accord the government the benefit of only "legitimate inferences." *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C.Cir.1983). In other words, this court will not indulge in fanciful speculation or bizarre reconstruction of the evidence. Moreover, this Court is not required to view the evidence through dirty window panes and assume that evidence which otherwise can be explained as equally innocent must be evidence of guilt. This is clearly not the standard of Rule 29. *See Curley*, 160 F.2d at 233 (if "a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained"). Rather, in order to find a legitimate and nonspeculative inference of guilt the government must articulate a rational basis in the evidence upon which that inference can arise.

This Court must grant Defendants' motion for judgment of acquittal if it finds that the evidence, even if viewed in the light most favorable to the government, is such that a reasonable trier of fact would have a reasonable doubt as to the existence of any of the essential elements of the crime. *United States v. Durant*, 648 F.2d 747 (D.C.Cir.1981); *see also United States v. Foster*, 783 F.2d 1087, 1088 (D.C.Cir. 1986).

## II. Conspiracy Count

The indictment charges that the Defendants, Recognition Equipment Inc. (REI or the Company), William G. Moore, Jr., the Chief Executive Officer and Chairman of the Board of Directors of REI, and Robert W. Reedy, Vice President for Marketing at REI, conspired with several unindicted co-

---

**1.** However, although this is a bench trial, this Court is not the trier of fact at this point and cannot determine credibility of witnesses until after the defense has presented its case and all of the witnesses have been cross-examined. In deciding a Rule 29 motion the Court at this time is simply applying a legal standard to the government's evidence.

Moreover, in reviewing the evidence, this Court does not consider Defendants' joint motion to dismiss the indictment with prejudice due to prosecutorial misconduct nor the government's response thereto.

conspirators to defraud the United States Postal Service (USPS) in attempts to obtain a contract for the Company's multiline optical character reading (MLOCR) equipment.[2]

The unindicted coconspirators included: (1) Peter E. Voss who was, prior to May 30, 1986, a member of the Board of Governors of the United States Postal Service and was, at various times, a member of the Board of Governors Contingency Committee, a member of the Board of Governors Technology and Development Committee, a member of the Board of Governors Planning and Executive Resources Committee, and the Vice Chairman of the Board of Governors; (2) Sharon R. Peterson, who was an administrative assistant to Voss; (3) John R. Gnau, Jr., who was a principal of the consulting and public relations firms of Gnau, Carter, Jacobsen and Associates, Inc., John R. Gnau, Jr. and Associates, Inc., and Gnau & Associates, Inc. (GAI); (4) Michael B. Marcus, who was a Director and the Treasurer of Gnau, Carter, Jacobsen and Associates, Inc. and a Director, the Vice President and Treasurer of GAI; and (5) William A. Spartin, who was President of GAI and President and Managing Director of MSL International Consultants Limited, an executive placement firm, which was a subsidiary of the Hay Group.

To establish a prima facie case under 18 U.S.C. § 371, the government must prove that (1) an agreement existed among the Defendants to defraud the USPS; (2) the Defendants knowingly participated in the conspiracy with the intent to defraud the USPS; and (3) that one or more persons knowingly and willfully committed an overt act in furtherance of that objective. *United ed States v. Treadwell*, 760 F.2d 327 (D.C. Cir.1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986); *United States v. Puerto*, 730 F.2d 627 (11th Cir. 1984); *United States v. Browning*, 723 F.2d 1544 (11th Cir.1984). For purposes of analysis this Court separates the conspiracy count into two parts: the Voss/Gnau payoff scheme and the Spartin personnel scheme. This Court finds that the evidence, viewed in the light most favorable to the government, does not support a reasonable inference that the Defendants knew of either scheme and that accordingly the government has failed to establish a prima facie case that the Defendants joined a conspiracy.

### A. Voss/Gnau Payoff Scheme

There is no doubt that a conspiracy existed between Voss, Gnau, Marcus, and Spartin whereby Voss received illegal payments from Gnau for referring REI to GAI. On May 30, 1986, Voss plead guilty to two counts of accepting a gratuity in violation of 18 U.S.C. § 201(g) and one count of embezzlement and misappropriation of government property in violation of 18 U.S.C. § 1707. *See* Criminal No. 86–195. On October 17, 1986, Gnau plead guilty to one count of conspiracy to defraud in violation of 18 U.S.C. § 371 and one count of paying an illegal gratuity in violation of 18 U.S.C. § 201(f). *See* Criminal No. 86–355. On January 20, 1987, Marcus plead guilty to two counts of aiding and abetting in paying an illegal gratuity in violation of 18 U.S.C. § 201(f). *See* Criminal No. 87–023. Spartin entered an agreement with the United States Attorney's office whereby he agreed to cooperate in the investigation in exchange for immunity from prosecution, if in fact prosecution would have been warranted, for any federal crime arising out of his activities involving the United States Postal Service. [GEX BS1, BS4]

Voss and Gnau had a criminal venture in operation before Voss had approached REI with the proposal that REI hire the services of Gnau. In December 1983 Gnau was promising Voss that if the USPS purchased some Chicago property that was owned by

---

**2.** REI had developed MLOCR equipment which would automatically read several lines of an address to code and sort the mail. At the time relevant to the charges in this indictment the USPS was employing singleline OCR which could only read the bottom line of an address and the efficiency of singleline technology was dependent upon the public use of the nine-digit zip code. The SLOCR technology was not successful because the USPS had greatly underestimated the public use of the nine-digit zip code. The USPS is now converting its automated sorting equipment to multiline technology.

a GAI client that he "would take care of him." [Tr. 619] Voss and Gnau had established a scheme whereby Gnau would send checks in the name of Decision Systems, Inc., for "industrial leads" or referrals to GAI. [Tr. 621–22] Prior to the time that Voss had approached REI, Voss and Gnau had targeted several companies for whom GAI could provide postal-related representation and use Voss' USPS connection to their benefit. [Tr. 620–37] No evidence has been presented that REI, Moore or Reedy knew of this criminal scheme.

### 1. The Voss Referral

The basic operative fact upon which the Government relies as indicia of conspiracy is that Voss in early September 1984 recommended to the Defendants the services of a specific consulting/lobbying firm for the promotion of the Defendants' product before the USPS. The government contends that a referral by a Governor of the USPS itself should have put the Defendants on notice.

Voss met with Reedy at the Mansion restaurant in Dallas on September 3, 1984 while Voss was there for the Technology Committee meeting with ECA. [Tr. 1176] During this meeting Voss told Reedy that he believed REI had a good product and that in the interests of the USPS he wished that REI would retain someone to aid them in packaging and presenting their product to the USPS. [Tr. 1176–77]

Robert Bray, REI's Vice President of Distributor Sales, testified that Reedy told him that Reedy asked Voss for suggestions as to someone who could help REI sell its product before the USPS but that Voss "was very hesitant to give names of any company [because it] wasn't his place to do so." [Tr. 1177] However, upon further queries from Reedy, Voss suggested GAI. [Tr. 1177]

This Court cannot find a legitimate inference from the fact of the referral itself that REI knew or should have known that a kickback scheme was being put into place. The government presented no evidence of the impropriety of a Governor having lunch with an officer of a company who was seeking to do business with the USPS. Several months prior to the time that Voss met with REI, he had publicly expressed caution in proceeding with singleline technology before studies ordered by Congress on the multiline/singleline debate were completed. [Tr. 1583] Moreover, the issue of multiline versus singleline technology was not simply a formal procurement issue within the USPS but was a subject of significant public debate involving executive studies, legislative inquiries and broad media exposure.[3] At a June 14, 1984 Congressional hearing the Office of Technological Assessment (OTA), the General Accounting Office (GAO) and postal management presented their respective views on OCR technology. [Tr. 1586] The GAO and OTA studies that were presented to Congress concluded that as a result of the USPS failure to convert to multiline technology the daily operational losses of the USPS were over one million dollars. [Tr. 1592] The inference that Reedy had to know in this context that Voss, a high and respected official of the United States government, who had been appointed by the President of the United States and confirmed by the United States Senate, 39 U.S.C. § 202(a), was initiating a scam to fill his own pockets is not justified.

### 2. Post-referral Conduct

Subsequent to the Voss referral the evidence suggests that REI cautiously exercised its business judgment in formulating a contract with GAI to represent it in the promotion of its product before the USPS. The Defendants did not immediately act upon Voss' recommendation to retain GAI.

GAI and REI did not reach a formal and executed agreement until almost six months after the initial referral by Voss. Although Gnau was ready to sign an agreement with REI as early as October 12, 1984 in a meeting with Reedy [GEX 107; Tr.

---

3. As evidence of the divisiveness of this very public debate Governor McKean testified that half of the Texas Congressional delegation was in favor of multiline technology and the other half of the Texas delegation was in favor of singleline technology. [Tr. 2839]

640–41, 643–45, 293–94]—five weeks after the Voss referral—the Defendants were unwilling to enter into an agreement without further consideration. In apparent frustration over the Defendants' delay in signing an agreement and their failure to return his telephone calls, Gnau did not complain to the Defendants but instead complained to Voss. [Tr. 645, 293, 307]

Bray testified that Reedy told him that Reedy did not want to hire GAI at any time prior to the November elections because, based on Gnau's representation, GAI was a politically-oriented consulting firm and Reedy thought that REI should wait until the political future of Washington, D.C. was clearer. [Tr. 1185] GAI and REI had not signed a contract in 1984 and as the new year began GAI was still having to sell itself to REI. GAI came to REI in Dallas on January 3, 1985 [Tr. 316, 322, 1978–79; GEX 473] and on January 7th or 8th Bray and an REI engineer visited GAI at its Bloomfield Hills, Michigan office to assess the technical competence of GAI to perform consulting services on behalf of REI. [Tr. 1621–22]

On January 8, 1985, Gnau wrote to Reedy to tell him that he had set up a meeting with Postmaster General (PMG) Paul N. Carlin on January 11, 1985 and asked for confirmation of a proposed consulting arrangement. [RR Ex. 30] Gnau testified that he did not tell REI that it was in fact Voss who set up the meeting between GAI and Carlin because Gnau was attempting to impress REI with the fact that GAI could secure for REI the political access it previously had been denied. [Tr. 655–57, 704].

On January 10, 1985, Reedy responded by a letter stating that REI intended to complete contract discussions and enter into a formal agreement with GAI in the following weeks and asked that GAI begin its representation of REI in its scheduled meeting with Carlin on January 12, 1985. Accordingly, Reedy enclosed with the letter a check for $10,000 as a partial payment toward the $30,000 retainer fee that GAI required. [RR Ex. 31; Tr. 658]

The meeting between GAI and Carlin was not encouraging for REI's interests. Carlin said that he did not want to interfere with his senior staff in this area and stated that "when it comes to multi-line technology and REI, there's nothing I can do for you in this regard." [Tr. 345] He suggested that GAI take REI's case up with the Technology Committee. Gnau did not inform REI of the disappointing results of his meeting with Carlin. Instead, on January 22, 1985, Gnau wrote to Moore to seek a date for a meeting at which they could finalize their proposed contract. [GEX 170] He wrote that, in his opinion, they could secure a formal review by the Board's Technology Committee and the eventual purchase order of 40–100 MLOCRs within 90–120 days from the beginning of January. Gnau's deception of REI—his alleged coconspirator—is unexplained.

During the latter half of January 1985 and most of February 1985, Bray participated at various times, together with REI's General Counsel Thomas A. Loose, and Associate General Counsel Carol Lyon, in drafting the formal agreement between GAI and REI. [Tr. 1623] As originally contemplated, REI would pay GAI a $30,-000 retainer and expenses. However, as to GAI's proposal that it receive 2% of the value of any contracts that the USPS awarded to REI, REI negotiated the contingency fee down to 1%. [Tr. 1624–25; GEX 189]

The contract was finally executed by REI on February 26, 1985 and returned signed by Gnau to REI on February 28, 1985. [GEX 189A, 189B] The government argues that the fact that the contract was dated "as of" January 15, 1985 is an indicia of guilty knowledge in the course of the contract formation. The government's claim is untenable. The evidence shows that January 1985 reflected the month in which REI had requested that GAI represent REI and REI had submitted the initial $10,000 and the 15th reflected the payment schedule for the retainer. [GEX 189; Tr. 358] Lyon testified that a contract is frequently executed on one date but is backdated to reflect when performance on the

contract actually began. [Tr. 992–93] The formal execution of the contract occurred six months after Gnau first met with Reedy.

### 3. Stature of GAI

The government also attempts to argue some type of inference of guilty knowledge by the purported fact of GAI's lack of stature as a consulting firm. In other words, the government attempts to create the impression that GAI was simply a "ghost firm" and that the Defendants accordingly must have known that GAI could have only been recommended by Voss for purposes of a kickback scheme. This inference is totally unsupported. The only evidence that the government offered in support of its theory was that GAI was a small three-man office headquartered in Bloomfield Hills, MI. This Court believes neither the size or the location of the firm is of significance one way or the other. The evidence in fact shows that GAI was a capable firm which presented a respectable client list to REI which included Ford Aerospace, [Tr. 620] Continental Airlines and Warner Amex Cable Communications, Inc. [RWR EX. 3]. Prior to the Gnau/Reedy meeting on October 12, 1984 Voss had briefed Gnau on the information and issues pertinent to REI to ensure that Gnau would have a "running start" in his sales efforts to REI. [Tr. 632, 698–700] Moreover, prior to REI's entering an agreement, Bray reported to Reedy that GAI's technical man, Marcus, was extremely conversant with the issues of OCR technology. [Tr. 1623] Finally, one of the reasons why REI hired GAI was precisely because GAI had political contacts which REI needed in order to open doors. For example, on January 8, 1985, Gnau wrote to Reedy stating that he had a meeting set up with PMG Carlin on January 11, 1985, and asking for confirmation of their consulting arrangement which was still unexecuted. [RR Ex. 30]

Moreover, as the relationship between GAI and REI developed and continued, GAI proved itself to be a hardworking outfit on the technical issues. Accordingly this Court can find no rational nexus between the standing of GAI and the inference of guilty knowledge.

### 4. Knowledge of GAI/REI Contract by REI Management

The government also cites as evidence the fact that the Defendants kept key members of REI management out of the informational loop on the GAI/REI contract. The government contends that this is conduct of guilty knowledge because it demonstrates that the defendants were attempting to hide their illegal arrangement. After a full review of the evidence this Court finds this contention manifestly without merit.

The only evidence that the government presented was that John Lawrence, Chairman of the Board of REI at the time the GAI/REI contract was formed, was never informed of the contract and that Bray was not apprised of all of the details.

As to Bray being out of the loop, this Court cannot accept the government's contention that Bray's lack of knowledge of every detail supports the inference that the Defendants were nefariously attempting to hide things from him. Bray was extensively travelling abroad in the fall of 1984 in accordance with his duties as REI's Vice President of Distributor Sales. [Tr. 1547–48] Notwithstanding, the Defendants apprised Bray of a great deal of the operative facts. Bray testified that Reedy had apprised him a few days after the Labor Day weekend in September 1984 that Voss wanted to meet with Reedy. [Tr. 1176] After the Voss/Reedy meeting, Reedy told Bray the contents of that meeting, including the fact that upon Reedy's inquiry Voss recommended that REI hire GAI to promote its product before the USPS. [Tr. 1176–77] This meeting is a critical operative fact according to the government in terms of when the conspiracy was joined by the Defendants and it is accordingly ironic for the government to contend at the same time that the Defendants were keeping Bray out of the informational loop when Reedy apprised Bray of the substance of this meeting. Reedy also told

Bray about his October 12, 1984 meeting with Gnau and Reedy and Bray discussed whether Reedy planned on following up on the Voss recommendation of GAI. [Tr. 1185]

Bray was not told to keep the fact of the Reedy/Voss meeting or the GAI referral a secret. [Tr. 1614–15] Bray further disseminated news of the Reedy/Voss meeting to others within REI. [Tr. 1615] Reedy himself had also told Israel Sheinberg, REI's Executive Vice President and a member of the REI Board of Directors, and George O'Brien, REI's Vice President of Finance, of his meeting with Governor Voss at the Mansion in September 1984. [Tr. 3815–17]

Accordingly, the fact that the Lawrence did not know of the Voss/Reedy meeting cannot support a legitimate inference that the Defendants were hiding an illegal arrangement in light of the evidence that Reedy and Bray were freely and openly discussing the Reedy/Voss meeting with others in the Company.

### 5. "Our Friend"

Notwithstanding the entirely normal process by which the GAI/REI contract was formed, the government relies upon a vague and isolated exchange between Reedy and Gnau in the course of the formation of the contract from which, the government argues, guilty knowledge can be inferred. At the October 12, 1984 meeting between Reedy and Gnau at the Admiral's Club at the Dallas–Fort Worth Airport Reedy asked about Gnau's relationship with Voss. Gnau stated that it would be better that in the future they just referred to Voss as "our friend" to which Reedy replied he understood. [Tr. 296] The government contends that this comment evidences Reedy's guilty knowledge. This Court is unable to agree with the government because to do so would require that this Court analyze the exchange in a logical vacuum and not in the context in which the exchange occurred or, for that matter, in the context of the entire contract negotiations between REI and GAI.

In order for this Court to accord legitimate and rational inferences from the evidence to the government, a logical nexus must exist between the evidence and the inference to be drawn therefrom; otherwise, the inference is simply speculation. In the instant case there is no nexus between the Gnau/Reedy exchange and the inference of knowledge of the illegal gratuity scheme. This Court cannot ignore the total context of the six-month negotiation process in determining whether the inference of guilty knowledge to be drawn from the "our friend" exchange is rational and reasonable. Although Reedy told Bray about his meetings with Voss and Gnau, Bray testified that he was never told to refer to Voss as "our friend." [Tr. 1621] Standing alone the exchange is ambiguous and innocuous at best and when viewed in the perspective of the entire fall 1984 period it can hardly be viewed as evidence of guilty knowledge.

### 6. Other Isolated Indicia of Fraud

Although this Court can find no evidence that the Defendants joined a conspiracy during the period in which they entered a contract for consulting services with GAI, the government nonetheless points to "badges of fraud" which illustrate that the Defendants ultimately were aware of the payoff scheme between Voss and Gnau. This Court has fully and carefully considered all of the evidence that the government presents as indicia of guilty knowledge.

#### a. Entries in Moore Notebooks

The government has introduced statements that Moore wrote in his personal/professional notebooks in the course of telephone conversations that he had with Voss. For example, one entry provides "making sure each governor has the letter in their hands, already made moves to slow down, making point, taking heat, and working for you." [GEX 64] Another entry provides "the business to be had here is substantial." However, this Court is unable to draw any reasonable inference of guilty knowledge from these entries because the full context of these telephone conversations is not before this Court where the government declined to call Voss

as a witness. For example, this Court cannot even determine whether the entry of "the business to be had here is substantial" is a statement by Voss or by Moore. In the absence of context this Court cannot reach a reasonable inference as to the meaning of the statement. Moore could have written the statement simply as his own observation in reference to something Voss told him which, if known to this Court, would completely foreclose a reasonable inference of guilty knowledge. Any suggestion by the government that these statements are evidence of knowledge of the Voss/Gnau conspiracy is conjecture that should be precluded under the Rule 29 standard.[4]

### b. May 24, 1985 Exchange Between Reedy and Gnau

On May 24, 1985, REI had made a presentation to the Technology Committee and various management personnel, including James V. Jellison, Senior Assistant PMG for Operations, in Dallas. [Tr. 1649] After the meeting Gnau and Reedy went off to another office. Gnau told Reedy that he thought REI was getting close to obtaining a contract. Reedy said he thought the Committee would recommend a sole source or add-on to the existing contract from what he had heard from Marcus. [Tr. 404] At that point Reedy asked what Gnau's arrangement was with Voss to which Gnau answered it's better that Reedy not know. [Tr. 404]

The government contends that this exchange is indicia of Reedy's knowledge because it demonstrates that Reedy suspected that there was an arrangement between Voss and Gnau. This Court agrees with the government that Reedy may have suspected that something could be going on between Gnau and Voss and, arguably to his credit, made inquiries. The fact that Reedy entertained suspicions cannot be equated with a prima facie case of guilty knowledge and an intent to join a conspiracy in the absence of evidence of deliberate avoidance. Although an individual clearly cannot avoid participation in a conspiracy by knowingly avoiding or ignoring illegal wrongdoing, the law conversely does not charge that private individuals must conduct independent investigations of their business associates.

There is no context in which this Court can determine what is a reasonable inference of the meaning of this exchange. Gnau specifically testified that he could not recall the "proper context" or the "lead-up statement" in which Reedy's question arose and accordingly any attempt by this Court to infer a meaning would be speculation. [Tr. 404] After Gnau testified that he could not recall the context of the exchange he immediately offered the testimony that he never told Reedy that Voss was on the payroll or that he was compensating him in any way. [Tr. 405]

### c. August 29, 1985 Meeting Between REI and GAI

On August 29, 1985, Gnau, Marcus and Spartin met at REI with Reedy, Bray, Phil Colquhoun and, for a time, Jenny Barker. [Tr. 454, 1331, 2445] One of the topics discussed was GAI's request for more money for its consulting services to REI. Gnau stated that his firm had been working on behalf of REI for the last eight months and that the original $30,000 retainer, paid in equal installments over the first three months, was exhausted and the expense reimbursement was inadequate to even cover office overhead. Gnau stated that unless his firm received additional retainer payments to provide current cash flow GAI would no longer be able to represent REI. [Tr. 1337, 1691–92, 2023] In response, Reedy agreed that GAI should

---

**4.** The government also argues that this Court can reasonably infer guilty knowledge by the fact that after January 3, 1985 there is no record of telephone conversations between Voss and Moore. However, the significance of this lack of subsequent communication between Voss and Moore—at least according to the telephone logs in evidence—is dependent upon the substance of the telephone conversations prior to this date. Apart from the occasional innocuous comments that Moore recorded in his notebooks—as discussed above—this Court has no evidence of what substantive communications were made between Voss and Moore. Accordingly, this Court has no rational basis to reach an inference of any type on the meaning of the cessation of telephone contact between Voss and Moore.

receive additional money and recognized that GAI had people to take care of. [Tr. 455]

The government argues that the reasonable inference in favor of the government to be drawn from Reedy's recognition that Gnau had people to take care of is that Reedy was aware of Gnau's illegal payments to Voss. However, to accept this argument would be to again ignore the context in which the statement was made. This statement arose directly out of Gnau's representations that he and Marcus were virtually working fulltime on behalf of REI but no longer had the money to even pay their overhead.

The innocuousness of this statement is further confirmed by the fact that not only is the request for an additional retainer premised upon the plausible ground that GAI's efforts on behalf of REI had depleted its cash resources, but Reedy actually bargained with Gnau on the financial package that REI was willing to provide Gnau with to cover his cash flow problems. Reedy told Gnau that REI would not be willing to pay GAI's requested $30,000 fee and eventually agreed to pay only $14,000 a month for GAI's consulting services which was to be deductible against the 1% contingency fee if it was ever earned. REI further agreed to pay GAI $6,000 a month for the public relations work that was formerly done for REI by Hill & Knowlton. Finally, REI put a cap of $2,000 on GAI's expenses because REI found GAI's past expense vouchers to be too high. [Tr. 455, 1695] The contract was consequently formally amended to reflect these new terms. [GEX 381] The evidence reflects that the negotiations were subject to the same hard-driving business considerations as any of the Company's other contracts.

The government's argument that the request for an additional retainer and the subsequent negotiations between Reedy and Gnau were simply contrivances is unsupported. The evidence also shows that the unindicted coconspirators were not shy among each other on the discussion of their earnings from their scheme. But there is no evidence that the Defendants were involved in these discussions.

### 7. Reedy's Deception to Postal Inspection Service

The government cites as evidence of coverup of the Gnau/Voss conspiracy, and hence guilty knowledge, the fact that on April 8, 1986, Reedy lied to Postal Inspectors when they asked who recommended GAI to REI. Reedy told the Inspectors that Bob John Robison, an REI lobbyist with Hill & Knowlton, had apprised REI of GAI. [Tr. 3352–53] The next time that Reedy met with Inspector Edwards he apologized for lying and told the Inspectors that Voss had referred REI to GAI. [Tr. 3366]

At the meeting in which Reedy lied to the Inspectors, Reedy and Thomas A. Loose, REI's general counsel, had told the Inspectors that they were upset with the Inspectors' "heavy handed treatment" of Bray earlier that day. Inspector Edwards had raised his voice with Bray and "pretty forcefully" told him that the Inspectors were investigating charges of bribery and conspiracy and that people would be going to jail and that Bray should get on the bus before it left the station. [Tr. 3346, 3348–50, 3363] Inspector Harrington, the second in command in the Inspection Service and a veteran of thirty-two years, testified that Inspector Edward's conduct was unsuitable. [Tr. 3446, 3467]

Reedy and Loose also told the Inspectors that they were suspicious of the Inspectors' motives for being at REI because on a prior occasion in 1979 the Inspection Service had frustrated REI's ability to compete in a procurement where it had subpoenaed REI's records and then later returned them without comment or action. [Tr. 3351–53] Inspector Edwards testified that Reedy and Loose were charging that "this current investigation was ... a contrivance to set up because REI was right on the verge of delivering a machine out in Phoenix to be tested.... So there was a feeling that we were there, in some way, to preclude REI from competing." [Tr. 3352, 3364–65] Inspector Edwards testified that

Reedy and Bray asked to whom the Inspectors reported and about the independence of their office. [Tr. 3353]

Regardless of the reason why Reedy lied to the Postal Inspectors, this lie alone could not support a prima facie case of guilt *beyond a reasonable doubt.* The Rule 29 standard is not simply whether there are instances of evidence in the government's case which on their own may reasonably support an inference of guilt but whether all those inferences constitute "evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Curley,* 160 F.2d at 232–33. Although the government culled its case—presented over the course of six weeks—for evidence upon which reasonable inferences of guilty knowledge could be reached, the government was unable to show that these inferences in total were sufficient to meet its burden of proof on a prima facie case, especially where this Court must reject some of the government's evidence as speculative or innocuous under the Rule 29 standard.

### 8. Total Failure of Direct Evidence Against Defendants

There is a complete lack of direct evidence to suggest that the Defendants knew of the illegal payoff scheme. All of the unindicted coconspirators who testified expressly stated that they never told Moore or Reedy about the payments from Gnau to Voss. [Tr. 306, 405, 562, 817, 2049, 2657, 2706] The government contends that the Court should not hold it to the burden of proving its case with direct evidence because in business fraud and conspiracy cases the evidence will generally be circumstantial due to the need for secrecy if the criminal venture is to be successful. This Court recognizes that knowledge is difficult to prove. *See United States v. Hooks,* 848 F.2d 785, 793 (7th Cir.1988) ("Because a conspiracy is by nature secret, its existence and common purpose must often be proved by circumstantial evidence."); *United States v. Redwine,* 715 F.2d 315, 320 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984) ("The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof."). However, this difficulty can in no way lower the standard of proof which this Court must hold the government to in establishing its prima facie case against the Defendants.

The conspiracy which in fact existed between Voss, Gnau, Spartin and Marcus was well-documented with direct evidence. These men openly discussed their illegal activity among themselves. The unindicted conspirators had even sought the advice of counsel on how to proceed with the distribution of their ill-gotten gains from the conspiracy and in fact reduced their distribution arrangement to writing. [Tr. 679–681, 1749] However, there is no evidence that the Defendants were ever included in a discussion of the conspiracy.

In late April or early May 1986, when Reedy and Bray were in Phoenix for purposes of preparing the site for the MLOCR test model, Reedy asked Gnau while in a restaurant whether Gnau had made any payments to anyone. Gnau answered "absolutely not" and explained that he had simply loaned Voss some money because Voss was having financial problems in connection with his divorce. [Tr. 561, 1807] Gnau assured Reedy and Bray that he had done nothing illegal. [Tr. 1807] Gnau testified at trial that he directly lied to Reedy and Bray "[b]ecause I did not want Mr. Reedy or Bray to know I had Mr. Voss on the payroll." [Tr. 562] Gnau testified that he wanted to continue receiving payments from REI and that if he admitted his own culpability in the scheme REI would terminate the relationship with GAI. [Tr. 691, 769]

### B. Spartin Personnel Scheme

The government contends that the Defendants conspired to defraud the United States government through the use of Spartin to effectuate personnel changes in the USPS. Although Spartin was President of GAI which was representing REI

before the USPS, Spartin at the same time was a managing partner of MSL, a search firm that was a subsidiary of Hay & Associates, with whom the USPS had contracted for executive search services. The Spartin personnel search prong of this conspiracy falls because the evidence before this Court fails to show that REI believed that the USPS did not know of Spartin's dual role. Rather, much of the evidence reflects that the Defendants had good reason to believe that Spartin's role with GAI as an REI advocate was open to the world in general and to the USPS in particular.

### 1. Lack of Direct Evidence

None of the unindicted coconspirators testified that they told any of the Defendants that Spartin's role with GAI and REI was a secret which could not be disclosed. Bray specifically testified that he was not told to conceal Spartin's GAI and REI role by either the Defendants or the unindicted coconspirators. [Tr. 1641]

### 2. March 5, 1985 Meeting in Lobby

After the March 5, 1985 meeting between REI and the Technology Committee in Washington, D.C., Gnau and Marcus introduced Spartin to Reedy and Bray as GAI's Washington Associate in the lobby of the Postal Headquarters in Washington, D.C. Spartin then spotted Governor John R. McKean, Chairman of the Board of Governors of the USPS, in the lobby. In an effort to impress REI with his contacts, Spartin walked directly over and greeted McKean. [Tr. 2397, 2667–68] Spartin returned to the GAI/REI group and they all proceeded to lunch in a public dining room at the Loew's L'Enfant Hotel which was located directly across the street from USPS headquarters. [Tr. 2398, 2666]

### 3. March 12, 1985 Letter

On March 12, 1985—one week after REI and GAI had met with the Technology Committee and Deputy PMG Jackie A. Strange—Marcus sent a letter to Governor Ruth O. Peters, Chairperson of the Technology Committee, with copies to Strange and Camp, on GAI letterhead. [GEX 206]

The letterhead showed in red ink that Spartin was the President of GAI. [Tr. 727–28, 730–31]

Strange responded to the letter in a memo to Peters. [GEX 209] Strange attached the March 12 GAI letter showing Spartin as President to her memo and circulated it to Peters, Voss, Camp, Harris and Jellison. [GEX 209; Tr. 3177] Further, the same March 12 letter was apparently recirculated within the USPS in December 1985. [*See* WGM EX. 16 (March 12 letter bearing December received stamp).

The government characterizes this as a mistake in the conspiracy. There is no evidence that the Defendants had reason to believe that the transmittal of this letter was a mistake. None of the unindicted coconspirators testified that they apprised the Defendants that the March 12, 1985 letter to the USPS was a mistake. Bray testified that REI knew that such letterhead—if not the March 12, 1985 letter specifically—had been sent to the USPS. [Tr. 1464, 1467]

When David Harris, Secretary of the Board of Governors, rediscovered the March 12, 1985 letter in his files on February 12, 1986, Harris wrote a memorandum expressly concluding that based on this letter "[i]t's obvious that management knows of the Spartin/Gnau/REI connection. Jackie's memo went to Jellison and he can add stuff together." [GEX 552; Tr. 3185] Harris further testified that given the fact that Spartin's name was listed on the letterhead as President of GAI he believed that "management knows, or had reason to know I should have said. I just assumed that they did." [Tr. 3186] Furthermore, at the March 3, 1986 meeting at which the Board terminated Spartin's contract with the USPS, Governor Tyler McConnel, a new member of the Board and an attorney, stated that with Spartin's name on the letterhead it would be difficult to argue that the recipients of that letter were not on notice of his identity with GAI: "when it's on the stationary it's pretty hard to say he didn't disclose it. I mean, that is somewhat wishful thinking, to think we can claim we didn't know it. I mean, unless you believe

the Mein Kamp theory, that the truth is big enough that we disbelieve. It was on their stationary. If we don't bother to read it, it's not like a firm—with all due respect, it's not like a long list of people at a law firm." [Tr. 2998; RWR EX. 180]

### 4. Spartin's GAI Office

Spartin's Washington, D.C. office at 1250 I Street was clearly identified as affiliated with GAI. On the wall behind the receptionist was a GAI sign in letters a foot high alongside a sign in smaller letters for Miner & Fraser. [Tr. 3231]

Moore and Reedy saw this office for the first time on March 27, 1985. [Tr. 2409] Members of the USPS management had also visited Spartin's office where the GAI sign was prominently displayed. Jackie Strange had visited the office on prior occasions [Tr. 2672] and on December 27 or 28, 1985, David Harris visited the office for an interview with Spartin for the PMG position. [Tr. 3171] Harris testified that he specifically noticed that the suite in which he was meeting Spartin was also used by GAI and that he knew GAI was an REI representative. [Tr. 3231] Harris testified that he "had an uneasy feeling that something was funny" [Tr. 3234–35] and, in response to his concerns, outside counsel for the Board of Governors investigated Spartin's association with Gnau which appears to have been commenced prior to the end of 1985. [Tr. 2957–59; RWR EX. 181]

### 5. Responsibility of USPS

Bray testified that he assumed that the USPS would in fact have investigated Spartin for conflicts of interest before hiring him. [Tr. 1642] Moreover, there is evidence that the issue of conflicts is not a particularly troubling issue for the USPS. For example, when the USPS searched for a public accounting firm to monitor the OCR procurement it approached the firm of Price Waterhouse. Price Waterhouse disclosed that it represented and audited REI and that it accordingly had a conflict of interest. Notwithstanding, the USPS was willing to consider Price Waterhouse. However, in the interest of maintaining the appearance of its independence, Price Waterhouse declined to continue with the prospect of representing the USPS.

This Court of course understands that it is the intent of the parties to defraud which governs and that fraud cannot be excused simply because the purported victim was in a position to prevent it. However, this Court brings out the above evidence to demonstrate precisely why in this context the inference that the Defendants had the intent to hide their association with Spartin is unreasonable.

### 6. Spartin's Absence From USPS Meetings

The government argues that this Court can infer that REI knew that Spartin's role as GAI was being withheld on the fact that Spartin did not attend the March 5, 1985 Technology Committee meeting or other USPS meetings with REI. This Court cannot find a reasonable inference of guilty knowledge based on this fact where there is no evidence that Spartin had any technical expertise for which his presence at USPS meetings would have been useful or necessary. As Spartin candidly apprised Moore and Reedy, he was not technically competent. [Tr. 2411] Rather, Spartin told Reedy and Moore that his role would as a strategizer and political operative. Spartin was not shy in emphasizing his White House background and political access to PMG Carlin and Governors McKean and Voss. [Tr. 1223, 2411]

### 7. Transfers and Removals of Jellison, Strange and Carlin

In connection with attempting to establish that the Defendants were aware of the Voss/Gnau payoff scheme and the Spartin personnel scheme, the government cites as evidence the fact that Jellison, Strange and Carlin were transferred or removed from their positions within the USPS. However, this Court can make no inference of guilty knowledge on the basis of these operative facts where the government provided no evidence that these individuals were in fact removed by the unindicted coconspirators in furtherance of the conspiracy. The only

evidence in this record is that Jellison, Strange and Carlin were fired for reasons independent of the conspiracy and by individuals other than the coconspirators.

Carlin testified that he was the one responsible as the PMG for removing both Jellison and Strange from the OCR procurement. Carlin testified that he ordered Jellison removed on July 12, 1985 because he was not responsive to the Board of Governors' mid-course correction to convert to multiline technology. [Tr. 2111, 2213] When Albert V. Casey became PMG, he testified that he needed to transfer Jellison out of his new position because he "had heard from McKean, from Ruth Peters, from Griesemer, from Voss, from everybody, that the Jellison situation was intolerable and wasn't working, and that he was not a reliable source of information to the board." [Tr. 3119] Although Casey offered Jellison a transfer to a position in Chicago, Jellison declined and resigned. [Tr. 3153–54]

As to Strange, Carlin testified that he had to remove her from OCR procurement because she had lost her effectiveness due to the intense public criticism and wanted to take her out of the line of fire.

Accordingly, the only rational inference that this Court can make from the removals of Jellison and Strange is that in order to effectuate the Board's midcourse correction mandate Carlin had to remove them from the OCR procurement.

The evidence shows that the Board of Governors unanimously voted to remove Carlin on January 6, 1986 because they were not satisfied with his performance. [Tr. 2979–80, 2988, 2991] The government has presented no evidence that the entire Board of Governors was involved in a conspiracy to remove Carlin or that any of the unindicted coconspirators exercised whatever influence they had over the Board of Governors to cause each of them to vote for Carlin's removal. For the government to suggest that the Board of Governors was simply an unwitting puppet of the conspiracy whose strings were pulled by Voss is, frankly, unreasonable and unsupported by the evidence. For example, Governor McKean told Spartin that he had been receiving reports from DPMG Strange and other Governors that Carlin's performance was not satisfactory. [Tr. 2473] McKean testified that after the completion of a number of interviews with regional PMGs who were critical of Carlin he determined that Carlin was simply not the right man for the USPS. [Tr. 2926–28] Spartin advised McKean to give Carlin a performance review and the opportunity to correct any problems that the USPS had with Carlin. [Tr. 2473, 2926–27]

On December 2, 1985, the Board of Governors met and discussed their dissatisfaction with Carlin's performance as Postmaster General. [Tr. 2927–28] McKean—not Voss—brought out the issue of Carlin's potential termination. Other Governors expressed their criticisms of Carlin and Governor Griesemer stated that he had actually discussed with Carlin his management and leadership problems. [Tr. 2928–29]

At the end of the Board of Governors meeting the Board resolved to send a Committee to talk with Carlin about his problems. [Tr. 2929] Governor Ryan acted as the spokesman for the group which also included McKean and Voss. [Tr. 2929] Voss only stayed for a few minutes. [Tr. 2138] Ryan told Carlin that not only was there criticism of his leadership but it was coming from those who should have been loyal to him. [Tr. 2930] Carlin appeared totally surprised about the criticism and offered no effective response. [Tr. 2930–31] McKean decided at that point that a decision had to be made about Carlin in the near future [Tr. 2931] and subsequently informed Spartin, although not yet hiring him, to begin to "keep his eyes open" for a replacement for Carlin. [Tr. 2933]

The government argues that the Defendants viewed Carlin and Jellison as "obstacles" to an REI contract with the USPS for MLOCRs on a sole source basis. [Tr. 1342] Bray testified that Carlin was opposed to REI receiving a sole source contract although it was the only company which had the technology to immediately meet the multiline needs of the USPS. [Tr. 1341] Moreover, Jellison told Reedy "that

Recognition Equipment would never get a Postal procurement while he was the head of Postal Service operations." [Tr. 1759] In November 1985, Moore directly stated to the Postal Inspection Service that "the Postmaster General is standing in the way of the multiline procurement matter." [Tr. 3336, 3383–84]

To the extent the Defendants had any role in the removal of Jellison, Strange and Carlin it was through Defendants' public criticism of USPS management to the Board of Governors, the United States Congress and the media. Carlin, Jellison and Strange were public employees and REI, as a taxpaying member of the American public, was entitled to criticize—and criticize hard—what it viewed to be the ineffective policy of USPS management in the OCR debate. The Defendants were entitled to tell the world that they viewed Carlin, Jellison and Strange as obstacles not only to REI but to the USPS itself. There is simply no reasonable inference of a conspiratorial or illegal link between the Defendants' motivation to get rid of Jellison and Carlin and the fact of their removal.

### 8. The PMG Search

Spartin ultimately received the formal go ahead to look for a candidate to replace Carlin as the PMG. The government contends that the fact that Spartin ultimately contacted the Defendants for suggestions on who would be a candidate for the PMG position is evidence that the Defendants knew of and were involved with Spartin's conflict of interest. There is no doubt that the Defendants knew of Spartin's dual role, but the question begged is whether the Defendants believed that the USPS knew of Spartin's conflict of interest as well. As extensively discussed in the above sections of this Memorandum Opinion and Order, the record is replete with evidence that suggests that REI believed that the USPS knew of Spartin's roles with both GAI and MSL.

The operative fact that Moore was contacted by Spartin for his recommendations for the PMG of the USPS cannot support a rational inference that the Defendants were aware that Spartin was not disclosing his role with GAI to the USPS. REI is a significant American corporation with business before the USPS and it presumably understood the needs of the agency and the type of candidate that it required as its PMG. The fact is that often the best sources of candidates for a position in an agency are precisely those who appear before that agency. Accordingly, Moore recommended three preeminent men in American business and industry to Spartin whom Moore knew either professionally or civically: Albert V. Casey, the former Chairman of American Airlines [Tr. 3090]; Chester Nimitz, former Admiral of the United States Navy and Chairman of the Board and Chief Executive Officer of the Perkin–Elmer Corporation [Tr. 737]; and John Lawrence, former Chairman of the Board of REI and Dresser Industries. [Tr. 1511] This Court cannot understand how it can make an adverse inference from that fact that Moore was requested by Spartin to make recommendations when there is no record evidence that Moore had any reason to believe that the Board of Governors, which had the responsibility for appointing the PMG, would not exercise its responsibility independently. The inference that the act of recommending a candidate for PMG is tantamount to taking over the personnel decisionmaking process of the Board of Governors is not supported by the evidence. The record before this Court demonstrates that the Board of Governors was pleased with the recommendation of Casey [Tr. 2503] and acted quickly to appoint him by a unanimous decision.

There is no evidence that Moore tried to hide the fact that he recommended Casey to Spartin for the position of PMG. When Moore, upon Spartin's urging, called Casey to measure his interest in becoming PMG, Moore never told or asked Casey to keep this conversation a secret or confidential. [Tr. 3155] Casey recalls confronting McKean in March 1986 and telling him that he had told McKean back in January of his acquaintance with Moore concerning this matter. [Tr. 3146]

When Spartin boasted of his role in putting Casey into the position of PMG at the

January 9, 1986 dinner at the Madison Hotel, Spartin testified at trial that Moore made a comment in substance that "I know Mr. Casey—I know he is an honest man, a smart man. He will do the right thing." [Tr. 2515] This evidence does not support a reasonable inference that Moore anticipated any favors from Casey as a result of Casey's recommendation and appointment to the position of PMG.

### 9. Moore Coverup of Spartin's Conflict of Interest

The government contends that a legitimate inference can be raised that Moore knew that the USPS was unaware of Spartin's association with REI because Spartin testified that Moore agreed to tell the Postal Service that it was Moore who had contacted Spartin with the Postmaster General recommendations. Even assuming that Moore in fact agreed to change the story of the manner in which Spartin learned of the recommendations,[5] this cannot support an inference of an intent to keep his relationship with Spartin a secret because it in fact directly demonstrates that he had a relationship with Spartin.

Subsequent to Spartin's request that Moore tell anyone who inquires that it was Moore who contacted Spartin with names of Postmaster General candidates, Moore consistently expressed his concerns to others that Spartin was trying to engage Moore in some type of coverup which he did not understand. For example, when Moore and Reedy had lunch with Gnau at the Maison Blanche in Washington, D.C. on April 14, 1986, Moore said that their attorneys were concerned about the meeting because of the ongoing investigation but he and Reedy were not doing anything wrong and simply wanted to determine what had really been happening between Voss, Gnau and Spartin. [Tr. 547] Moore told Gnau that he was very concerned about Spartin trying to involve him in an effort to change the facts. [Tr. 548, 552–53] A month later Moore again told Gnau while attending a reception on the White House lawn that he

was concerned that Spartin was trying to involve Moore in some type of coverup. [Tr. 553] Gnau testified that he did not have the impression that Moore participated in a coverup but only that Spartin was attempting to involve Moore. [Tr. 553]

### III. Theft Count and Receipt of Stolen Property Count

Count Two charges the Defendants with theft of property used by the USPS with a value in excess of $100 in violation of 18 U.S.C. § 1702. Count Three charges the Defendants with receipt of stolen property with a value in excess of $250 in violation of 22 D.C.Code § 3832. The basis of these counts is a copy of a twenty-page brochure that ElectroCom Automation (ECA), REI's competitor which had obtained awards from the USPS for singleline OCRs, provided to the USPS in connection with its November 4, 1985 presentation to Postal Service management and the Technology Committee and that Governor Voss immediately afterwards gave to Marcus, the technical consultant at GAI.

The government has conceded that these counts "cannot stand alone without the conspiracy count." [Tr. 4130] Notwithstanding this concession, this Court notes that even if the conspiracy count survived the Defendants' motion this Court would still grant the Defendants' Rule 29 motion as to counts two and three on the grounds that the government has failed to establish a prima facie case of the jurisdictional value of the ECA brochure.

The government has presented evidence of the jurisdictional value based solely on the cost of the formal preparation of the document. The cost-of-production approach to value is skeptically viewed by courts as a reliable method, see, e.g., United States v. Whetzel, 589 F.2d 707, 710–11 (D.C.Cir.1978); Lund v. Commonwealth of Virginia, 217 Va. 688, 232 S.E.2d 745 (1977), and even when cost-of-production is accepted as a means for determining value it has been only where other substantial

---

**5.** In a polygraph examination that Spartin underwent for the Postal Inspection Service Spartin expressly denied that Moore—or anyone else

at REI—had agreed to participate in any of Spartin's efforts to hide his own conduct. [Tr. 2627]

evidence exists indicating the value of the stolen property. *See, e.g., United States v. Drebin,* 557 F.2d 1316 (9th Cir.1977), *cert. denied,* 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). The government has cited to this Court no decision in which cost of production alone has been be used as a means to determine jurisdictional value. This Court cannot accept the government's cost-of-production approach where it has presented no evidence upon which this Court can reasonably infer that there is a rational nexus between the cost of producing the document and the value of the knowledge contained therein.

ECA had been told not to include competitively sensitive information in its presentation. [Tr. 10–11] Although Robert C. Buzard, the President and CEO of ECA, testified that the "market value of the information ... [was] enormous" [Tr. 2345] he provided no basis upon which he reached this conclusion and the only specific information that Buzard claimed was proprietary was that his company's updated SLOCR machines performed 17% better than its prior model. [Tr. 2342] However, testimony in the Congressional Record for October 23, 1985 disclosed that the performance increase for the ECA's updated SLOCR was 15%. [Tr. 2279] There was no evidence suggesting that knowledge of the 2% difference between the Congressional Record information and the ECA brochure information was of a materiality to reach the jurisdictional values except for Buzard's general testimony that it was "a piece of information that has a big competitive value." [Tr. 2346] Marcus testified that the document was "not anything substantive" [Tr. 2040] and that when he received the brochure he thumbed through it and called it a "PR piece" [Tr. 2039–40]

### IV. Wire and Mail Fraud Counts

The government also concedes that if the conspiracy count does not survive the Defendants' Rule 29 motion then the wire and mail fraud counts must also fail because, as the government concisely stated, "the conspiracy count and the mail and wire fraud scheme track each other," and the government has presented no evidence independent of the conspiracy against the Defendants which would support a conviction under the wire and mail fraud statutes. [Tr. 4160]

### V. Conclusion

After a full and hard review of the government's evidence presented over a six-week period there is no legitimate or reasonable inference, even when viewed in the light most favorable to the government, that the Defendants knew beyond a reasonable doubt of any conspiracy to defraud the United States Government and the United States Postal Service in violation of 18 U.S.C. § 371.

Accordingly, it is hereby

ORDERED that the Defendants' joint motion for judgment of acquittal is GRANTED to all Defendants and on all counts.

### ORDER

This matter is before the Court pursuant to the Defendants' joint motion to dismiss the indictment with prejudice due to prosecutorial misconduct. In light of this Court's November 20, 1989 Memorandum Opinion and Order granting Defendants' joint motion for judgment of acquittal it is hereby

ORDERED that the Defendants' motion to dismiss the indictment is DENIED as moot.